556 A.2d 675

**Tom V. THOMASIAN**

v.

**Silva K. THOMASIAN.**

**Nos. 714 and 979, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

April 26, 1989.

Kevin G. Hessler (Harvey B. Steinberg and Miller & Steinberg, on the brief), Rockville, for appellant.

Bryan Renehan (Brodsky, Greenblatt & Renehan, Chartered, on the brief), Gaithersburg, for appellee.

Argued before MOYLAN, ALPERT and ROBERT M. BELL, JJ.

ROBERT M. BELL, Judge.

Neither Tom V. Thomasian, appellant/cross-appellee, nor Silva K. Thomasian, appellee/cross-appellant, is happy with the judgment of the Circuit Court for Montgomery County and, so, they have both appealed. In his appeal, Mr. Thomasian asks:

1. Did the trial court abuse its discretion in awarding combined alimony and child support totaling in excess of $46,000.00 per year?

2. Did the trial court err in awarding rehabilitative alimony for five years without first making a determination of Mrs. Thomasian's present earning capacity?

3. Did the trial court exceed its authority and impermissibly transfer personal property incident to the divorce by requiring that Dr. Thomasian's name be removed from two bank accounts titled in the names of the parties and each of their children?

Mrs. Thomasian's cross-appeal presents four additional questions, namely:

1. Was it error to award only rehabilitative alimony where there was no evidence that the wife could make substantial progress toward being self-supporting and the husband earns over $200,000.00 per year?

2. Did the court err when it failed to consider the effect of the reduced counsel fee, child support and monetary award when awarding the plaintiff rehabilitative alimony?

3. Is the husband's $12,442.00 of accrued holiday and vacation leave marital property, as it was earned during the marriage and the husband could contractually elect to use or be paid for it upon his leaving employment?

4. Is real estate acquired during marriage in the husband's sole name marital property?

## Alimony and Child Support Award—Excessive?

This matter was before the circuit court on exceptions, filed by both parties, to the Report and Recommendation of the

Domestic Relations Master. The evidence before the Master established that appellant was employed as a Senior Health Officer, the equivalent of a hospital resident, at Providence Hospital. In that capacity he earned $34.00 per hour and, when on call, an additional $5.00 per hour. The record also reflected that appellant worked extremely hard in that position, earning since 1983, in excess of $140,000.00 per year.[1] It was projected that, at the rate at which appellant was working at the time of the hearing, he would earn more than $220,000.00 in 1988.

■ Appellant argued before the Master and the lower court, as he does here, that the alimony and child support award should not have been based upon earnings generated by the number of hours he actually worked.[2] His position was that he could not continue to work at that pace; indeed, he contends that he was required to work at that pace simply to meet his *pendente lite* obligations.

The Master determined that appellant's income was in the neighborhood of $220,000.00 a year and, therefore, awarded child support and alimony to appellee in an amount in excess of $53,000.00 a year. The court, on exceptions, appears to have agreed, in part, with appellant. It found that it was "unconscionable" to base appellant's alimony and child support obligations upon "an annual salary which would indefinitely necessitate a 110 hour work week." Nevertheless, it reduced the recommended amount by only about $7,000.00, an amount which appellant maintains "failed to achieve a reduction to a level that would permit Dr. Thomasian to resume working hours that are somewhat closer to human."

On this appeal, therefore, appellant argues that alimony and child support awards totaling more than $46,000.00 per

---

1. In 1983, working on an hourly basis, and being on call, appellant earned $145,856.00; in 1984, $170,051.00; in 1985, $170,951.00; and in 1986, $196,845.00.

2. At the time of the divorce, appellant was working, on average, more than 100 hours per week.

year are excessive. Once again, he relies upon the fact that the awards are based upon an annual salary generated by the long hours and being on call. He does not dispute that he actually works those hours or that he actually makes the amount of money attributed to him.

Appellant invites us to disregard the facts as they actually exist and to base the award of alimony and child support upon facts which may or may not ever exist, *i.e.*, to project what might be a "more normal work week" for him. We decline the invitation. Indeed, we think appellant cries hurt too soon. He does not dispute that he makes the amount of money attributed to him, albeit he does so only by working the number of hours attributed to him as well. Nor does he dispute that, given his actual earnings, the amount set by the court is not unreasonable. Under these circumstances, we fail to see how an award of alimony and child support in the amount set by the court is an abuse of discretion.

Rather than anticipate an inability on the part of appellant to continue to maintain the pace that he has set for himself, and the consequent generation of the earnings he has enjoyed for the last several years, the court is required to consider the facts as they are, not as they may be projected to be at some time in the future. Appellant has the opportunity, and the option, should the circumstances and his situation change, to seek a reduction in alimony and child support based upon those changes. At that time, the court would be in a better position to make a determination based upon the facts as they actually exist at that time, as to appellant's actual ability to pay. We think that the court would have abused its discretion had it based the child support and alimony award upon its perception of what would be a more "normal" work week for appellant, in total disregard of the facts as they actually exist.

### Alimony—Rehabilitative or Indefinite

Mrs. Thomasian testified that she suffered an hereditary

disease, retinitis pigmentosa,[3] and, therefore, is unable to work in her field of expertise.[4] She also testified that she was not trained in any other field. Mrs. Thomasian also testified to suffering from depression and to having to severe anemia and varicose veins, the latter of which required surgery in 1985.[5]

The Master determined that Mrs. Thomasian's eye condition rendered her unemployable in her field and, further, that there was no evidence of her employability in any other field. She, therefore, recommended that Mrs. Thomasian receive alimony for an indefinite period in the amount of $2350.00 per month. The court granted appellant's exceptions in part. Characterizing the testimony concerning Mrs. Thomasian's vision problems as "inconclusive", the court ordered alimony payable

"... for the next five *only* as rehabilitative alimony. The question of whether or not the plaintiff can make progress toward being self-supporting can be answered during that time period. Upon competent medical testimony from a specialist in the field which establishes the plaintiff's inability to secure employment, the plaintiff may request a further hearing on the issue...." (Emphasis in original)

Appellant's appeal of that order challenges its propriety. He argues:

---

**3.** The evidence reflected that Mrs. Thomasian had seen several doctors regarding her eye problems. Although all of them seemed to agree that she had a vision problem, there was no unanimity as to its cause. It was Dr. Finkelstein of the Wilmer Institute at Johns Hopkins Hospital who diagnosed her problem as retinitis pigmentosa.

**4.** Mrs. Thomasian earned a degree in Biology, shortly before she realized the extent of the disability caused by her vision problems.

**5.** Appellant did not object to the testimony concerning his wife's vision problems; in fact, the evidence was that he described his wife's condition, in his deposition as "a hereditary eye disease retinitis pigmentosa with loss of more than 50% of total vision, with color blindness and poor dim light vision."

The wife, in effect, is being rewarded for not meeting her burden of proof; for not being able to substantiate her alleged medical disability with competent medical testimony at the time of the original hearing. She is being awarded rehabilitative alimony and afforded additional time to produce evidence regarding her earning capacity that should have been produced at the original hearing. Dr. Thomasian is put in the position of having to foot the bill for Mrs. Thomasian's failure of proof.

Mrs. Thomasian has appealed as well. For her part, she argues that, where, as here, appellant earns more than $200,000.00 a year and there is no evidence that Mrs. Thomasian could make substantial progress towards being self-supporting, it is reversible error for the court to award only rehabilitative alimony. She agrees with appellant, apparently, that "[t]he statute clearly does not contemplate that a spouse be awarded rehabilitative alimony for a period simply to test their ability to become self-supporting."

■ Maryland Family Law Code Ann. § 11–106(c) provides:

(c) *Award for indefinite period.*—The court may award alimony for an indefinite period, if the court finds that:

(1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

(2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

Although, under our statutory scheme, the principal function of alimony is rehabilitation, requiring that the economically dependent spouse be required to become self-supporting, *see Holston v. Holston,* 58 Md.App. 308, 321, 473 A.2d 459 (1984), *cert. denied,* 300 Md. 484, 479 A.2d 372 (1984); *Rosenberg v. Rosenberg,* 64 Md.App. 487, 531, 497 A.2d 485 (1985); *Campolattaro v. Campolattaro,* 66 Md.App. 68, 75,

502 A.2d 1068 (1986), this section provides a mechanism whereby the court may, under appropriate circumstances, award indefinite alimony. The burden of proof as to the existence of the prerequisites to entitlement is upon the economically dependent spouse who seeks alimony for an indefinite period.

■ Both the Master and the trial court focused on subsection (c)(1). The Master determined that Mrs. Thomasian's vision problem rendered her unemployable in her chosen field; the trial judge, on the other hand, determined, and, consequently, held, that the evidence concerning Mrs. Thomasian's vision problem and her employability was inconclusive. Having reached that conclusion, the trial judge nevertheless decided to award rehabilitative alimony, thereby leaving the questions of appellant's employability[6] and ability to become self-supporting for resolution during the term of the rehabilitative alimony.

There is merit in appellant's position. Although § 11–107(a), provides a mechanism whereby the period of rehabilitative alimony may be extended,[7] it contemplates an extension based upon some changed circumstances occurring during the period when rehabilitative alimony is being paid. It does not contemplate the situation presented here wherein the court awards the rehabilitative alimony intending that the decision whether it will continue to be rehabilitative or will be changed to indefinite alimony would be finally determined during that period. The trial judge did not cite any authority permitting him to structure the award as he did, and we know of none. Indeed, as we have

---

**6.** The Master specifically determined that there was no evidence concerning Mrs. Thomasian's employability in a field other than her chosen one.

**7.** That section provides:

(a) *Extension of period.*—Subject to § 8–103 of this article, the court may extend the period for which alimony is awarded, if:

(1) circumstances arise during the period which would lead to a harsh and inequitable result without an extension; and

(2) the recipient petitions for an extension during the period.

already pointed out, neither does Mrs. Thomasian; she agrees with appellant insofar as appellant maintains that rehabilitative alimony may not be awarded in lieu of proof of entitlement to indefinite alimony. The matter must be remanded for further proceedings, specifically, for a determination of whether, at this time, Mrs. Thomasian is entitled to indefinite alimony.

The issue raised by Mrs. Thomasian on her cross-appeal does not change the result. She appears to contend that there is evidence in the record supporting the conclusion that, given the respective earnings of the parties, it is necessarily true that Mrs. Thomasian qualifies for indefinite alimony pursuant to subsection (c)(2). Suffice it to say that that issue was neither presented to nor decided by the court and, therefore, we will not address it. *See* Maryland Rule 8–131(a). If necessary, this matter may be considered by the court on remand.

Accrued Holiday and Vacation Leave: Marital Property?

During his employment, appellant accrued more than 180 hours of vacation time and more than 180 hours of holiday time.[8] At his rate of pay, $34.00 plus an hour, the accrued holiday and vacation leave had a total value of more than $12,000.00.[9] Mrs. Thomasian unsuccessfully sought to have

---

8. These accruals are an exception to the hospital leave policies. The assistant director of personnel testified, that it is hospital policy that holiday time may not be carried over from year to year and that only 72 hours of vacation may be carried on a yearly basis.

9. The personnel policy and the assistant director's testimony are clear that an employee who has accrued vacation time would be paid for that time upon his or her termination of employment. Although not quite so clear, the following colloquy suggests that the same policy applies to holiday time:

Q [By Appellant's Counsel]: Okay, I have just a couple of questions I wanted to clarify with respect to holiday and vacation or annual leave, whatever it is. If Dr. Thomasian were to resign for any reason and would stop working and suppose we can assume, based on what you have on record for him, 184 holiday hours and his resignation was effective today, would he get any type of money for that holiday time?

this accrued leave considered by the court when it determined whether to make a monetary award. She renews that effort on appeal.

■ Marital property is defined as "the property, however titled, acquired by 1 or both parties during the marriage." [10] Maryland Family Law Code Ann. § 8–201(e)(1). This definition is, as Mrs. Thomasian recognizes, rather expansive. It, "when considered in a broad sense, is a term of wide and rather comprehensive signification.... It has been stated that the term embraces everything which has exchangeable value or goes to make up a man's wealth— every interest or estate which the law regards of sufficient value for judicial recognition." *Deering v. Deering*, 292 Md. 115, 125, 437 A.2d 883 (1981), quoting *Diffendall v. Diffendall*, 239 Md. 32, 36, 209 A.2d 914 (1965). Thus, in Maryland, a non-vested, non-contributory pension interest has been held to be a variety of marital property rather than a mere expectancy of gain. *Deering*, 292 Md. at 127, 437 A.2d 883. Similarly, a stock option plan has been held to be marital property. *Green v. Green*, 64 Md.App. 122, 136, 494 A.2d 721 (1985). So, too, has that portion of a workers' compensation award compensating the husband for loss of any earning capacity during the marriage. *Queen v. Queen*, 308 Md. 574, 586–87, 521 A.2d 320 (1987).

The rationale for reaching the conclusions reviewed above is instructive. In *Deering*, the Court of Appeals adopted the reasoning of the Supreme Court of California in *In Re Marriage of Brown*, 15 Cal.3d 838, 126 Cal.Rptr. 633, 544 P.2d 561 (1976):

---

A Only if they were programmed prior to the time that he left. In other words he had asked for a day of holiday time prior to the day he terminated, he would then get that time.

**10.** Even when the property is acquired during the marriage, it is nevertheless excluded as marital property if it was acquired by inheritance or gift from a third party; excluded by valid agreement; or directly traceable to property acquired before the marriage or from the aforementioned sources. *See* Maryland Family Law Code Ann. § 8–201(e)(2).

In holding that in a non-vested, non-contributory pension interest is a variety of marital property rather than a mere expectancy of gain, the *Brown* Court reasoned that "[s]ince pension benefits represent a form of deferred compensation for services rendered, the employee's right to such benefits is a contractual right derived from the terms of the employment contract. Since a contractual right is not an expectancy but a chose in action, a form of property, . . . an employee acquires a [judicially recognized] property right to pension benefits which he enters upon the performance of his employment contract." . . . Moreover, the court explained, the fact that a non-vested pension interest may be contingent upon continued employment does not "degrade that right to an expectancy [because] [t]he law has long recognized that a contingent future interest is property." . . . Such contingencies, explained *Brown,* should be taken into account by the trial court, not when determining whether the retirement plan is property includable in the marital estate, but, rather, when allocating the property rights between the parties to the divorce. . . . We are persuaded that the view expressed in *Brown* . . . squares with the concept embodied in § 3–6A–01, which on its face includes all forms of "property" as marital property to be considered by the chancellor when adjusting the equities of the husband and wife, and we here embrace it. (citations omitted)

292 Md. at 127–28, 437 A.2d 883. In *Ohm v. Ohm,* 49 Md.App. 392, 431 A.2d 1371 (1981), a case in which we reached the same result as *Deering,* we observed, as did the cases we cited in support of our conclusion, "that retirement benefits are a form of deferred compensation or wage substitute and the right to receive such benefits, being contractual in nature, is a chose in action and thus, property." *Id.* at 397, 431 A.2d 1371.

The rationale underlying *Green* is similar. Specifically, we stated:

> As with pension plans, restricted stock option plans like those we consider here are a form of employee compensation, providing to the employee the right to accept within a prescribed time period and under certain conditions the corporate employer's irrevocable offer to sell its stock at the price quoted. If the employer attempts to withdraw that offer the employee has "a chose in action" in contract against the employer. We therefore conclude that stock option plans, like other benefits in an employee's compensation package, constitute "property" as used in the definition of marital property.

64 Md.App. at 136, 494 A.2d 721. We rejected the notion that, because the plan was unassignable and, therefore, unsalable, having no fair market value, that it was valueless. On the contrary, we said that it was "an economic resource, comparable to pension benefits, to which a value can be attributed." 64 Md.App. at 137, 494 A.2d 721.

This precise issue was presented to the Supreme Court of Alaska in *Schober v. Schober*, 692 P.2d 267 (Alaska 1984). There, Mr. Schober, an Alaska state trooper had over 400 hours of accrued, but unused personal leave. Under the terms of his contract with the State, he could use the leave as paid vacation or convert it to cash. Mrs. Schober unsuccessfully sought to have the trial judge consider the unused leave as a marital asset. In denying that request, the trial court was of the opinion that the leave was contingent and, therefore, not a present asset.

The appellate court reversed. It pointed out that Mr. Schober's interest in his unused leave was, rather than an expectancy, a chose in action, a form of property, because his right to paid vacation constituted deferred wages for services rendered and, consequently, vested as the labor was rendered. As a result, the court determined that Mr. Schober's interest was like a pension or retirement benefit, a form of deferred compensation. The court concluded, therefore, that the unused leave was a marital asset and should have been considered by the trial court in determining how to divide the Schobers' property.

Even though it is closely akin to that used by the Court of Appeals and this Court in *Deering, Ohm,* and *Green,* we are not persuaded by the rationale of the Alaska Court. Nor are we satisfied that simply because the definition of property in our Act is expansive enough to encompass accrued holiday and vacation entitlement, it necessarily does. We just are not persuaded that accrued holiday and vacation entitlement is the same as a pension or retirement benefits, a form of deferred compensation; since it replaces wages on days when the worker does not work, it is really only an alternative form of wages. *MEA/AFSCME Local 519 v. City of Sioux Falls,* 423 N.W.2d 164, 166–67 (S.D. 1988). It need not be liquidated by the payment of cash; it may be, and often is, dissipated when the person entitled to do so, takes vacation or holiday time. Thus, it is far from as tangible as, and much more difficult to value, not to mention more personal than, a pension or retirement benefits. Accordingly, we hold that accrued holiday and vacation entitlement is not marital property. It follows that the court did not err in refusing to consider it in determining whether to grant a monetary award.

Savings Accounts—Marital Property?

During the marriage, two bank accounts, each titled in the joint names of appellant and Mrs. Thomasian and one of their two children, were opened by Mrs. Thomasian. At the time of the hearing, one of the accounts contained a total of $55,403.33 and the other, $53,391.93.

The testimony concerning the purpose of these accounts was conflicting. Mrs. Thomasian testified that the money belonged to the children; that the accounts were established for the purpose of providing for their college education and expenses. She also testified that tax returns, in which the interest on the accounts was reported, were filed on behalf of the children. Appellant, on the hand, testified that titling the accounts in the children's names was for the purpose of avoiding the payment of income taxes on the money. The Master determined that the bank accounts were established as educational trust accounts for the bene-

fit of the children. On exceptions, the court agreed, holding that "the fact that [the] agreement was not formalized or reduced to writing in no way obscures the clear intent of the parties to establish an education trust for the benefit of the children." The court ordered that the bank accounts be retitled in Mrs. Thomasian's name for the benefit of each of the children.

Appellant, relying upon § 8–202(a)(3),[11] argues that by so doing, the court transferred the ownership of personal property from one party to the other incident to a divorce, something that is prohibited by Maryland law. We do not agree.

■ Maryland Family Law Code Ann., § 8–202(a)(1), provides: "When the court grants an annulment or a limited or absolute divorce, the court may resolve any *dispute* between the parties with respect to the ownership of personal property." (Emphasis added) There was presented to the court a dispute as to whether the bank accounts were the personal property of appellant and Mrs. Thomasian or of the children. That dispute was resolved by the court's determination that the bank accounts belonged to the children, that they were intended to benefit the children and provide for their education. The court's resolution of the conflict was not clearly erroneous, *see* Maryland Rule 8–131(a), nor was it unauthorized. Accordingly, we conclude that the court did not contravene § 8–202(a)(3); it did not, incident to the divorce, transfer an ownership interest in the accounts from one party to the other.

## Miscellaneous

In view of the fact that the matter must be remanded to the lower court for further proceedings, it is necessary that we address, but only briefly, the remaining issues raised by

---

11. Section 8–202(a)(3) provides: "Except as provided in § 8–205 [Marital Property—Monetary Award] of this subtitle, the court may not transfer the ownership of personal or real property from 1 party to the other."

Mrs. Thomasian. We do so simply for the guidance of the lower court on remand.

Mrs. Thomasian asserts the court failed to take into account the effect that reductions in child support, the monetary award, and counsel fees, would have on her entitlement to alimony. She relies on *Campolattaro, supra*, which stands for the proposition that alimony and monetary awards are significantly interrelated and largely inseparable, the decision to award one or both must be made after consideration of them in their mutual context, 66 Md.App. at 75, 502 A.2d 1068. She argues that the court was at least required to acknowledge that it had considered the interrelationships and, since it failed to do so, the reduced monetary award should be vacated and further proceedings to determine the appropriate amount should be conducted.

We remind Mrs. Thomasian that in *Campolattaro*, we did not retreat from the presumption that trial judges know and correctly apply the law; rather, we simply acknowledged that it is possible to rebut the presumption based upon what the trial judge says or does not say. We do not need to dwell on the issue, however, since the matter must, be reconsidered on remand in any event. At that time, the court will have a full opportunity to make sure that it considers the monetary award issue, whether and in what amount to award one, in the context of any alimony award made, whether permanent or rehabilitative.

It is disputed whether the court determined that appellant's home, acquired during the separation, but before the divorce, was marital property. Appellant contends that it did, while Mrs. Thomasian contends that it did not. Appellant's position is tantamount to conceding that the court should have considered the home as marital property even if it did not do so. *See Campolattaro*, 66 Md.App. at 81, 502 A.2d 1068. On remand, the court should make clear that, in addressing the monetary award issue, it has considered appellant's home as marital property. When fixing the value of that property pursuant to Maryland Family Law

Code Ann., § 8–204, however, the court may not speculate as to the cost of its liquidation. *See Rosenberg v. Rosenberg,* 64 Md.App. 487, 526, 497 A.2d 485 (1985); *Green v. Green,* 64 Md.App. 122, 149, 494 A.2d 721 (1985).

 The property is not excluded by means of a valid agreement. *See Falise v. Falise,* 63 Md.App. 574, 581, 493 A.2d 385 (1985), *See also Carsey v. Carsey,* 67 Md.App. 544, 549–54, 508 A.2d 533 (1986). In order to be effective, the agreement must be sufficiently specific as to make clear that the property is to be "non marital" or, in some other terms, specifically exclude the property from the scope of the Marital Property Act. The record does not reflect any such agreement, either as to the bank account, which the parties agreed to divide amongst themselves, appellant using his one-half to purchase the home, or as to the home itself.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEE.